1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


JEFFERY DALE GRANTHAM,                        )
                                              )
                Plaintiff,                    )
                                              )
        vs.                                   )        CASE NO.
                                              )   2:19-CV-00065-LGW-BWC
CSX TRANSPORTATION INC., a                    )
corporation, BRIAN MURRAY,                    )
REBECCA GARDNER, GUS THOELE,                  )
                                              )
_____Defendants._____        )



MOTION HEARING
BEFORE THE HONORABLE LISA GODBEY WOOD
November 10, 2021; 2:00 p.m.
Brunswick, Georgia

APPEARANCES:

For the Plaintiff:          F. TUCKER BURGE, III, Esq.
                            Burge & Burge
                            Renasant Place
                            2001 Park Place
                            Suite 1350
                            Birmingham, Alabama  35203
                            (205) 251-9000
                            tucker@burge-law.com


For the Defendants:         WALKER S. STEWART, Esq.
                            Hall, Bloch, Garland & Meyer
                            577 Mulberry Street
                            Suite 1500(31201)
                            P. O. Box 5088
                            Macon, Georgia  31208-5088
                            (478) 745-1624
                            walkerstewart@hbgm.com


Reported by:                Debbie Gilbert, RPR, CCR
                            Official Court Reporter
                            801 Gloucester Street
                            Post Office Box 1894
                            Brunswick, GA 31521-1894
                            (912) 262-2608 or (912) 266-6006
                            debra_gilbert@gas.uscourts.gov

2

```
 1              P R O C E E D I N G S

 2            (Call to order at 2:06 p.m.)

 3       THE COURT:  Good afternoon.

 4       MR. BURGE:  Good afternoon.

 5       THE COURT:  Ms. Sharp, call the next case.

 6       THE CLERK:  Case Number CV-2:19-65, Jeffrey Dale

 7  Grantham versus CSX Transportation, Incorporated, Brian Murray,

 8  Rebecca Gardner, Gus Thoele.  Frank Burge, Sr. for the

 9  plaintiff.  Walker Stewart for the defendant.

10       THE COURT:  Ready for the plaintiff?

11       MR. BURGE:  Yes, Your Honor.

12       THE COURT:  And ready for the Defense?

13       MR. STEWART:  Yes, Your Honor.  If I could ask one

14  question, I have Rachel Vail, who is a recent law school

15  graduate.  She's not taken the bar yet but has helped with

16  preparation.  Would it be okay if she sat here at the counsel

17  table?

18       THE COURT:  Absolutely.

19       MR. STEWART:  Thank you, Your Honor.

20       THE COURT:  Well, counsel, let me begin by saying that,

21  of course, I've been able to read all the briefing back and

22  forth.  I know that we've got the two motions for summary

23  judgment, the defendants' motion and then the plaintiff's motion

24  as to liability, and there's also a motion that's been referred

25  to the magistrate judge on the admissibility of Ms.
```

3

1    Boatright-Scruggs' testimony, and we're here today to focus on

2    the dispositive motions, the two motions for summary judgment

3    that have been filed, and if I'm not mistaken I believe the

4    defendants' was the first one.

5            So we will start with you, Mr. Stewart, and, as I said,

6    rest assured that I'm familiar with the case and the facts and

7    the arguments that you're making.  This is simply your

8    opportunity to augment your written product in any way that you

9    would like, and, of course, I have a few questions to ask as we

10   go along.

11           All right, Mr. Stewart.

12           MR. STEWART:  Thank you.

13           May it please The Court, Your Honor, where I'll start is

14   with the individual defendants in this case, Mr. Thoele, Mr.

15   Murray and Ms. Gardner, now Griffin.

16           THE COURT:  And I'm glad you start there because, you

17   know, although the briefing is voluminous, from what I can tell,

18   it really boils down to about four points of disagreement.

19           You're going to start with one of them.  I think it's

20   your contention that those individuals simply didn't have enough

21   of a role to be liable under the FRSA, and then as far as I can

22   tell, the other main points for disagreement are which causation

23   standard is appropriate for the FRSA in the retaliation context,

24   whether the temporary removal from service following what I

25   refer to as the clown comment is considered an adverse action

4

1 and a fundamental disagreement as to whether punitive damages

2 are in play, and from what I can tell, those are the four main

3 issues that you're fighting over.

4       Is that about the sum of it?

5       MR. STEWART:  I think from probably the big perspective.

6 Of course, there's things downstream from that and what they

7 mean particularly when you're talking about the causation

8 standard being important --

9       THE COURT:  Right.

10      MR. STEWART:  -- because I think that is a significant

11 issue here, and under the facts is -- we'll get to that, but,

12 Your Honor, I think that is a fair summary of where I think some

13 of the really critical issues are.

14      THE COURT:  Let's start with, as you suggest, with the

15 individual liability for Murray, Gardner and how do you say --

16      MR. STEWART:  Thoele.  I assume -- he's from originally

17 Louisiana, and so I understand that's some weird Cajun last name

18 that's not pronounced the way it's spelled but it's Thoele.

19      THE COURT:  Okay.

20      MR. STEWART:  And I think the starting point, Your

21 Honor, with the individual defendants is the statutory language

22 itself, 20109(b)(1), which says that a railroad or an officer

23 and employee of the railroad shall not discharge, demote,

24 suspend, reprimand or in any other way discriminate against an

25 employee for engaging in protected conduct here, and so it has

1   the specific lists and then says "in any way discriminate."

2        Now, the only ways in which the plaintiff contends the

3   statute has been violated is by the discipline, the suspension

4   connected to the violation for failing to work safely and

5   efficiently and then the removal from service.

6        Those are the two adverse actions that have been alleged

7   in this case by the plaintiff.  We know from the cases that

8   simply charging, bringing a charge against an employee is not an

9   adverse action.  It's not the type of conduct the statute is

10  intended to target.

11       And so from that, none of these individual defendants

12  were involved in making the decision either as to removing Mr.

13  Grantham from service.  That was made by Ms. Gardner's superior

14  in Jacksonville and then communicated back down the chain of

15  command, and then we know -- and he was deposed in the case --

16  Mr. James Turner, who was chief mechanical officer --

17            THE COURT:  He said, "I did it."

18            MR. STEWART:  -- he said, "I did it; I had the final

19  review of the transcript, and I made the decision that there was

20  a rule violation and that the three-day suspension was

21  appropriate under the CSX policy."

22       So it is clear both from the plaintiff's claims in this

23  case and the statutory language itself that these employees

24  cannot be personally liable under the statute for their actions

25  of simply following the process laid out in collective

6

1    bargaining agreements and bringing a discipline charge and

2    carrying that out to its conclusion, when they did not actually

3    participate in the actions that are the subject of this

4    particular lawsuit.

5         I mean, I would ask, if James Turner had decided there

6    was not a rule violation, couldn't turn around and sue Mr.

7    Thoele and Ms. Gardner and Mr. Murray for simply bringing

8    charges that ultimately ended up not being proven according to

9    the officer making the decision.

10        I would also just say that the effect of holding

11   officer -- I mean, managers and supervisors liable for simply

12   carrying out one of their duties, which is to enforce legitimate

13   company rules, and potentially subjecting them to personal

14   liability for beginning what is an investigatory process that

15   leads to a hearing where the employee is represented and can

16   present testimony and evidence would have some real consequences

17   for those employees and how they go about particularly -- and we

18   will get to this in another context -- but supervisors of

19   employees who regularly engage in protected conduct as part of

20   their job.

21        What supervisor wants to try to pursue legitimate

22   charges if they know that the people they are pursuing those

23   against engage in protected conduct all the time and can make

24   the charges that are made here?

25            THE COURT:  Let's look forward to the heart of the

7

 1    dispute as I view it and that is looking back up toward the

 2    causation issue --

 3         MR. STEWART:  Sure.

 4         THE COURT:  -- and that standard.  You've now seen the

 5    briefing from the plaintiff.  What's wrong with it?

 6         MR. STEWART:  I think what's wrong with it is they

 7    continue to focus on the temporal proximity chain of events

 8    theory of causation that as long as it happens at the same time

 9    and begins a chain of events that that is sufficient evidence to

10    submit the case to a jury.

11         I think where the administrative review board is, very

12    clearly in some of its recent opinions and where the circuit

13    courts -- the Eleventh Circuit has not spoken on this issue as

14    we know -- have referenced intentional discrimination and

15    rejected the idea that temporal proximity is enough, and I think

16    in this situation explains why that is the case and why

17    intentional discrimination and ideas of proximate causation are

18    important where you have --

19         THE COURT:  If your job was in and of itself to do that,

20    how could you ever; right?  If your job was to report defective

21    rail cars and you were inspecting something and hit your boss in

22    the face and then reported it, got to let that go; right?

23         MR. STEWART:  Or if, you know, in a situation like this

24    where -- you're exactly right, Your Honor -- Mr. Grantham's, I

25    mean, his job from Day One from the first training to his

8

1  apprenticeship to the recurring training is how to identify

2  defects as established by the federal government, how to report

3  those properly.  He's given equipment and instructions on how

4  specifically to do that, and he did it throughout his career, so

5  you're exactly right, Your Honor.

6       If you took this fact scenario and you changed out that

7  Mr. Grantham took a nap for 30 minutes and then turned this

8  train over to transportation and then there was a delay because

9  he also reported bad orders, this would insulate or prevent CSX

10 from taking legitimate action for violations that contributed to

11 a train being delayed, and so, Your Honor, you're exactly right

12 under these facts -- and it's actually I think the last time

13 Your Honor considered the FRSA, this was an issue that you

14 struggled with some.

15       THE COURT:  This is the 2017, 2017 Wittig case?

16       MR. STEWART:  That's right, yes, ma'am.

17       THE COURT:  Let me make sure I understand the parameters

18 of what you're arguing, and you would agree that, I think, Mr.

19 Burge has set forth the strong language about the FRSA, that

20 it's much easier for a plaintiff to satisfy the prima facie case

21 than in a traditional McDonnell Douglas Title VII burden-

22 shifting and all the reasons historically and the statutory

23 history of the passage of why that is, and we know in Title VII

24 arena, there are times when just plain old temporal proximity is

25 enough.

1        Hypothetically, why couldn't it be enough in FRSA

2    settings?  I understand you're saying not in this case with the

3    facts that have been adduced, but let me test the limits of your

4    statement.

5        Are you saying that it could never be enough in FRSA,

6    temporal proximity, so, let's take, for example, someone whose

7    job is not a core of it to report safety defects.  Would

8    temporal proximity, could it be enough?

9        MR. STEWART:  I don't think standing alone, Your Honor.

10   I don't think temporal proximity by itself, and what I would say

11   is we can go back to -- and I think this is how the ARB has

12   gotten here and the other circuits have -- is going back to

13   statutory language and the reference to discrimination.  It's

14   looking at and targeted at discrimination against protected

15   conduct.

16       And discrimination is intentional conduct, to

17   discriminate is, and so we've got to have more than simply

18   temporal proximity in any circumstance in order to establish for

19   purposes of a jury or for purposes of meeting the plaintiff's

20   burden of showing the prima facie case.

21       THE COURT:  Discrimination is so often elusive of proof.

22   It's the kind of thing that people don't usually yell out "I'm

23   doing this because you're making safety reports."

24       And that's why even in Title VII contexts, sometimes

25   temporal proximity is a good proxy at least to have enough

1    evidence to get to the jury, and so in this setting, where we

2    start from the premise that plaintiffs sort of have an easier

3    row to hoe just as a foundational premise, why wouldn't temporal

4    proximity sometimes be enough in some FRSA cases?

5         MR. STEWART:  I mean, standing here, would there ever be

6    a set of facts where the temporal proximity, I can't think of --

7    because I think where the situation you might -- might not

8    have direct, like you said, direct evidence of discrimination

9    can be elusive at times.

10        At times, there's -- but circumstantial evidence of the

11   way in which, you know, is this conduct that goes along with the

12   temporal proximity.

13        THE COURT:  Like in Wittig, there was really nothing

14   else that the train conductors had ever done and they make the

15   report that the cruise control malfunctioned and that's why we

16   went too fast, and then they got fired for going too fast.

17        MR. STEWART:  Well, that's right, and in Wittig, the

18   safety malfunction at issue is what caused the overspeed

19   violation.  I mean, you had a --

20        THE COURT:  Exactly.

21        MR. STEWART:  Everything was right there, and Your Honor

22   was very concerned about, in that case, that, wait a second,

23   where is the proof that these railroad employees, if they were

24   doing what, Railroad, you say they should have been doing, could

25   have complied with this speed restriction, and I think that

1   played a large role in this is that it was not -- you had these

2   very connected comments and then not clear evidence separating

3   out the report from the conduct at issue.

4         THE COURT:  Conduct.

5         MR. STEWART:  Here, as we will get into, Your Honor,

6   we've got one or two unrelated events.  We have Mr. Grantham's

7   response to these employees, which occurs 45 minutes to an hour

8   before he does the protected conduct, which is reporting the bad

9   orders.

10         We don't have this interconnection between the violation

11  and the report of a safety issue that existed in Wittig and I

12  think made temporal proximity, Your Honor, at least more

13  compelling in that case as a consideration, even though it's our

14  contention that that's not enough standing alone, but there were

15  questions about -- since there was questions about could the

16  employees have complied with this, then, you know, there's

17  your --

18         THE COURT:  It's an unusual situation.

19         MR. STEWART:  Yeah.

20         THE COURT:  So in this case, the railroad says, "Well,

21  you know, job effects came your way because we sent you help and

22  you refused it."

23         MR. STEWART:  That's right.

24         THE COURT:  And is there some evidence that even if he

25  had accepted help, it would have been the same result; the delay

1   would have ensued?

2        MR. STEWART:  The delay would have ensued.  A delay

3   would have likely ensued, and here is where I think is

4   important, Your Honor, is, and to back up just a second, Mr.

5   Grantham was working with another car inspector who has to

6   unexpectedly leave and his manager shows some grace and says,

7   "You need to go deal with that situation."

8        So from the manager's standpoint, he's dealing with an

9   unexpected situation himself and, to address that, sends two

10  other carmen to help Mr. Grantham complete this inspection, and

11  the evidence at the hearing was that, from the carmen that were

12  sent, was that he turned them away and told them to go to the

13  north side, that he had it, quote, under control.

14       That was the evidence that was before the court.  Mr.

15  Grantham admitted, when I took his deposition, and I think -- I

16  don't have a page cite -- I'm sure it's in our briefs -- when I

17  said, "Would you have completed the Class 1 inspection," which

18  was Grantham's job, "in a more timely and quicker fashion," he

19  said yes.

20       So the importance there is, to get the train out of the

21  yard, there are certain things that have to happen, the

22  completion of the Class 1 brake test being one of those that has

23  to occur before other things begin to occur.

24       In this case, before bad-ordered cars are set out of the

25  train, before they determine when there is -- there's limited

13

1   tracks, as you can imagine, departing the yard, so the people in

2   charge of that, kind of like air traffic control, have to get

3   the train out of the yard.

4        A what's called a Class 3 reinspection, which is the

5   final inspection, has to occur, so, Your Honor, what it changes

6   is -- and I think Ms. Gardner references this as well as Mr.

7   Murray -- if you change the time when Mr. Grantham completes his

8   inspection, you change the circumstances about when they begin

9   this next set of tasks.

10       And so was part of the delay related in this case to

11  setting out the bad order?  Yes, ma'am.  I mean, I'm not going

12  to stand in front of -- but CSX --

13       THE COURT:  Your point is it was at a minimum

14  exacerbated by the refusal of help.

15       MR. STEWART:  It was part of it.  He was supposed to

16  turn the train over at two o'clock.  He turns it over at 2:30,

17  and then there is a two-hour delay beyond that.

18       If he is able to turn that train over earlier than 2:30,

19  which he said he could have done with the help, because, as

20  you've seen, Your Honor, this train that he was inspecting was

21  very long, and at times they have to run on both sides of the

22  train.

23       Well, as you can imagine, if you have two or three

24  people and you divide and conquer these tasks, it can be done

25  more efficiently, and so that's really the crux of this.

14

1          And so it goes back to the point we've been discussing,

2     Your Honor, which is, if CSX looks at a train delay and says,

3     "Well, part of this was our employee's conduct and rule

4     violation; part of it is related to this report of the bad-

5     ordered cars and part of it's related to some of these other

6     logistical issues that are part of getting the train out," is

7     CSX prevented from acting on that misconduct, and that's the

8     example I used.

9          If he had been taking a nap, if he had been texting with

10    his girlfriend and, you know, sitting in his truck for 20

11    minutes, is he protected from that simply because, by the end of

12    this he --

13         THE COURT:  It's going to end up.

14         MR. STEWART:  -- identifies and reports bad-ordered

15    cars.

16         THE COURT:  Well, let's flip to the clown comment and

17    the effects that that episode has on the outcome of your motion.

18    Is that temporary removal from service following -- and as I

19    understand it, the undisputed facts are that it was later

20    determined that it was another person who made those comments.

21    But is the temporary removal itself, how do I resolve whether

22    that even qualifies as an adverse action?

23         MR. STEWART:  I think there are two important points

24    that we've raised, the first being whether it even constitutes

25    an adverse action for a -- CSX in this context -- to act in

1    response to what even the plaintiff says they understood to be

2    or interpreted as a threat and that they followed their

3    practices and policies related to that situation, which even Mr.

4    Grantham said in his deposition, he said, "No, if they perceive

5    a threat of workplace violence, removing an employee from

6    service is an appropriate response."

7          I believe he agreed with that in his deposition, and so,

8    first of all, on the adverse action issue, it goes back to a

9    railroad should not be prevented from taking reasonable action

10   to investigate a situation even if it determines the original

11   facts, as it understood it, were incorrect and it very quickly

12   moves to determine the real facts and exonerate that employee.

13         I mean, that again has some real effects downstream if

14   the railroads are not allowed to take that action because I

15   think we can all agree, especially in this day and age, that

16   threats of intimidation or things -- I mean, how many times have

17   we seen an event and somebody looks out afterwards and says,

18   "You know what, they made a comment and I wish I would have

19   looked at that differently," and so with that -- but the other

20   part of this, Your Honor, is that they have to show that the

21   adverse action was the result of -- was influenced by -- it was

22   a result of discrimination for bad-ordering these cars, which

23   temporal proximity --

24         THE COURT:  ...prior to the report.

25         MR. STEWART:  We're now almost a month since the June

16

1   30th date of --

2       THE COURT:  And I think Mr. Burge says, "Well, but we

3   wouldn't even be in this arena, having that call, except for the

4   original."

5       MR. STEWART:  That goes back to the chain of events and

6   the chain of events getting even -- we're now extending it by a

7   few more links in the chain to get to this point, Your Honor,

8   and it comes back to this is that, once again, the manner in

9   which those comments were interpreted had nothing to do with the

10  substance of the hearing, with what was at issue, the charges or

11  anything along those lines.

12      The comment was interpreted in the manner it was because

13  there was this investigatory hearing the following day, and so

14  again, CSX, in this situation, cannot take what I think is

15  agreed is reasonable response because there is a hearing the

16  next day?  Are they insulated or prohibited from taking actions

17  against an employee that, yes, it was interpreted like it was

18  because the hearing?

19      This is probably nothing more than, you know, light or

20  disrespect -- or I don't know what the proper word is -- and so,

21  Your Honor, you then have to look to determine I think finally

22  "Let's look at CSX's actions from the point this comment is

23  made, and is there any sense that these actions evidence a

24  discriminatory motivation or animus," and there is none.

25      I mean, the comment occurs immediately after the safety

1    call ends.  The two managers on the call, Mr. Murray and Mr.

2    Hale, speak to one another and both agree that they think it was

3    Grantham.  Mr. Grantham is not here but he is large and has got

4    a very deep kind of south Georgia accent.

5           They both believed it was him.  They then do what they

6    needed to do, which was report it to Ms. Gardner.  Ms. Gardner

7    collected written statements from both of them saying that it

8    was Mr. -- they believed it was Mr. Grantham.  Ms. Gardner has

9    then got to go to her bosses in Jacksonville because admittedly

10   this is not something that occurs every day, especially in

11   advance of a hearing.

12          So the following day they go forward with the hearing.

13   Mr. Grantham is removed from service at that point in time.

14   It's not until after the removal from service that the other

15   carman, Mr. Moore, comes forward.  Mr. Moore and Mr. Grantham

16   then speak that night, and Mr. Moore says, "It was me and I've

17   gone there and taken responsibilities for it."

18          The charge letter goes out the following day so there is

19   no delay in CSX's part to initiating this process.  The

20   corporate representatives and supervisors have said, "Hey, look,

21   we needed to get all of this kind of on the record and, you

22   know, yes, we have a written statement but we kind of need

23   everybody to say it and make sure that we've got the facts

24   straight here."

25          So the letter goes out the next day, Your Honor, and

18

1   that's a Friday.  The hearing is convened the following

2   Wednesday morning, and it lasts I think less than 20 or 25

3   minutes and consists of "Mr. Moore, did you say it?"

4         "Yes."

5         "Mr. Grantham, did you say it?"

6         "No."

7         "Mr. Grantham, you can go back to work," and he goes

8   back to work the following day.

9         THE COURT:  No pay is docked or anything?

10        MR. STEWART:  He gets his pay reinstated and all of that

11  occurs.  So this is not the actions of a company that's acting

12  to punish or retaliate against an employee.

13        It's dealing with a situation that was in front of it,

14  and when the facts changed, it moved very, very quickly to

15  address this.  You can see just from the timeline of the charges

16  and hearing on the inefficiency charge that the letters and the

17  hearing can be over a much more extended period of time.  They

18  moved extraordinarily quickly on this.

19        THE COURT:  Which in some way dovetails to the last

20  major issue of contention, and that's with regard to the claim

21  for punitive damages, and it's my understanding that it's your

22  position that there is simply no evidence of malice or ill will.

23        MR. STEWART:  Not only that, Your Honor, I think we know

24  from all different contexts, when punitive damages, as they are

25  called, are intended to punish for conduct that's not just in

1   violation of the statute, but it's -- because the statute itself

2   is targeted at retaliation, so it's more than simply that, and

3   this is where we get back to the individual defendants.

4        I don't think that they are parties even to the

5   violations we've been talking about, but when you get to

6   punitives, I mean, the undisputed evidence that the plaintiffs

7   agree to is CSX had training in place that was provided to all

8   of the managers about anti-retaliation, about that they were

9   prohibited from retaliating.

10       The managers acknowledged they received this training,

11  that they understood not to retaliate, that nobody in this case

12  has faulted Mr. Grantham for bad-ordering the cars on June 30th.

13       Everybody has said, "Yes, ma'am, he recognized defects

14  properly," because sometimes they can be challenged.  I mean,

15  you can have a disagreement about whether there is a bad order.

16       Every single manager said, "No, these had to be taken to

17  the shop; we don't disagree with anything he did as far as

18  reporting the bad orders that day," but the conduct of CSX in

19  this case that trained its managers, has discipline policy in

20  effect which was followed to the T here -- he was sent a letter

21  offering a reprimand; or if it went to a hearing, the letter

22  said, and you're found in violation, it's a three-day

23  suspension -- was exactly the punishment or the discipline that

24  was imposed, and so CSX had training in place, had procedures in

25  place and policies which were followed to a T here, and the most

20

1    that the plaintiff is saying, "Well, we've got temporal

2    proximity and these things that we contend show this," but we

3    certainly have no conduct on its face that is close to

4    warranting punitive damages and punishment of a company for its

5    actions.

6           THE COURT:  Is there any evidence in the record that any

7    employee has ever been disciplined in any way for reporting

8    these kind of problems?

9           MR. STEWART:  No, Your Honor, and I think that's one of

10   the more important portions of the record.  The evidence is

11   overwhelming that the answer to that is no in a couple of

12   different ways.

13          Mr. Grantham worked for CSX for 40 years.  Now, for a

14   significant period of the first part of his career, he was

15   furloughed and so -- but he was back at work in the nineties and

16   worked until this incident in 2017.

17          So it was 20-plus years all as a carman.  He had never

18   received any discipline from CSX related I believe to bad orders

19   or anything else.

20          In fact, he had been given a thanks award, a monetary

21   award, by Mr. Murray like two months before all of this

22   happened.  And so there's that evidence.

23          We have specific evidence of Mr. Grantham's reports of

24   bad orders I think in like the three months leading up to this,

25   that this is something he regularly did, and then we also have

1   evidence in the record of what are called the yard operating

2   plans or system records that show every single train that comes

3   through the forwarding yard and is inspected for the entire

4   month of June of 2017, and if you look at each of those days,

5   you can see there are regularly cars that are bad-ordered.

6          You can also see that there are times when there are

7   cars bad-ordered and the delay is specifically attributed to the

8   fact that bad-ordered cars were in that train and had to be set

9   out, and even on June 30th, 2017, this day, I think there are

10  three other trains in which different carmen identified

11  bad-ordered cars, and so that leads to that question, Your

12  Honor, when you go back to causation of if everything is the

13  same and we've got all of these employees bad-ordering cars and

14  nobody has been disciplined.  The plaintiffs produced no

15  evidence of any discipline, reprimand, suspension, anything

16  along those lines.

17          What's different about Mr. Grantham's circumstances

18  here?  Well, the difference is that the manager took action to

19  try to assist him with the situation that was not -- it wasn't

20  created by Mr. Grantham, obviously, and there was evidence put

21  forth at the hearing that Mr. Grantham turned that help away and

22  sent them to the north side of the yard without informing

23  anybody of his conduct and telling them he had it under control,

24  which simply wasn't the case, and was not working efficiently,

25  which is an important rule at any employer and particularly at a

22

1    railroad.

2         THE COURT:  Okay, well, Mr. Stewart, thank you.  Let me

3    hear from across the aisle and I appreciate your arguments.

4         MR. STEWART:  Yes, ma'am.  Thank you, Your Honor.

5         THE COURT:  Yes.

6         MR. BURGE:  Good afternoon.

7         THE COURT:  Good afternoon.  Let me start you where I

8    started your colleague across the aisle.  Is that a fairly good

9    summary of the major disputes between the parties?

10        MR. BURGE:  I would say that factually there is not much

11   in this case that isn't disputed from the --

12        THE COURT:  As far as the legal issues, though, that

13   we're looking at, the causation standard, which is a huge one,

14   the clown comment, whether that's an adverse action, and how

15   this fits in to the overall scope of the case and liability for

16   the three individuals and the punitive damages as far as

17   application of the law to the facts, which there are disputes in

18   many of the factual areas, but as far as the legal issues go,

19   are there any other big topics that you want to address?

20        MR. BURGE:  I don't think there are.  I think that, you

21   know, as far as it being a protected activity, it certainly is a

22   protected activity.  As far as the knowledge goes, you know, the

23   Eleventh Circuit says knowledge is part of contributing factor.

24   We're not going to put it out and separate it out because

25   obviously you can't -- it can't be a contributing factor if you

1   didn't know about it.

2          If the protected activity wasn't known about, then it

3   couldn't be a contributing factor, so the Eleventh Circuit's

4   test only had three elements, but most of the District Courts --

5   and that was in another AIR 21 setting, framework setting, but

6   most of the FRSA cases that I have seen and the jury

7   instructions that the judge gave last week all have knowledge as

8   the second element, and clearly everybody involved, all the

9   individuals knew that he had bad-ordered cars that resulted in a

10  train delay.

11         THE COURT:  Well, take to me to the causation standard.

12         MR. BURGE:  The causation standard is due in whole or in

13  part.  It is not proximate cause.

14         The Supreme Court faced in the FELA setting about ten

15  years ago the same argument for proximate cause in *McBride*

16  *versus CSX*, and they said, "No, we meant what we said; when

17  Congress comes in and they choose their words, then courts are

18  not to substitute judge-made tests like proximate cause."

19         So when FELA, when we say resulted in whole or not part,

20  we mean did it contribute no matter how small.  And that's what

21  happened here because they can come in here and they can say,

22  you know what, we're going to tell everybody that it had only to

23  do with him -- they say sent them away, and obviously that's a

24  huge factual dispute as to whether he sent anybody away.

25         But they are saying, "Oh, well, he sent them away and

24

1   that's one of the reasons we're doing it."  The jury doesn't

2   have to say that's the only reason.  The Supreme Court in

3   *Bostick* just said not long ago that there can be many causes,

4   even under the because-of standard, there can be many

5   because-ofs, and here we're even under a more forgiving standard

6   from the employee's standpoint, due in whole or part no matter

7   how small.

8          THE COURT:  How do we get around the problem that Mr.

9   Stewart mentions when an individual like Mr. Grantham has as a

10  part of his job flagging safety violations or safety issues, how

11  do we get around him not just getting a pass to do anything?

12         MR. BURGE:  When I started practicing law -- and it's

13  getting longer and longer ago --

14         THE COURT:  This is going to be a long answer, I can

15  tell.

16         MR. BURGE:  It is.

17         THE COURT:  Sort of cut to the quick.

18         MR. BURGE:  But when I got started, there was not this

19  protection and people would report an injury, for example, and

20  they would get fired and there's really nothing they could do.

21         THE COURT:  Don't want that but how do we rectify what

22  he --

23         MR. BURGE:  The reform -- the reform came, and the

24  reform says, "Listen, if it has any part at all, if it -- if

25  it -- if you are treating them differently" --

1      THE COURT:  But I don't understand how that gets around

2  the problem here.

3      MR. BURGE:  See, I don't see that as a problem.  The law

4  says you don't do this, and because you do not do it, then just

5  don't.

6      Now this isn't a case where somebody is napping or doing

7  anything else.  He was working.  He did everything all by

8  himself.  He buckled every hose on a 130-car train.

9      THE COURT:  And I don't think defense counsel is

10  suggesting that he was napping.  It is simply a way to arrive at

11  the best application of the causation standard to test the

12  limits on either side.  So I don't think anyone is contending

13  that he's napping.  It's a way to try to help figure out what

14  the best standard, the best application is.

15      MR. BURGE:  I think the fact that they had to go with

16  napping because they were uncomfortable talking about the facts

17  of this case says a lot because you cannot -- another thing

18  *Bostick* teaches us is change one thing.  Let's just change one

19  thing and see if it changes the outcome.

20      He doesn't report any cars?  What does the

21  decisionmaker, James Turner, say?  Well, then the flags are down

22  at two o'clock.  30 minutes ahead of the scheduled departure

23  time, so you cannot separate their charges, which are train

24  delay, and -- and they use ellipses in the brief, and that's

25  something -- and I know my -- I may have been dictating and may

1  have shown my teeth in my brief, and to the extent I did, I

2  apologize, but it just got all over me that they were trying to

3  hide from the fact that their charge letter says this is about a

4  train delay.

5      And their rule says, "This is about a train delay," and

6  now they want to come in and say, "No, it's not really about a

7  train delay; it's about the fact that we sent some people to

8  help and, you know, they didn't help you."

9      Of course, they didn't get charged and they didn't

10  report -- and they didn't engage in the protected activity by

11  reporting anything.

12      THE COURT:  Help me understand how the individuals stay

13  in the case.

14      MR. BURGE:  Mr. Murray has been telling Mr. Grantham --

15  and he is the only one of the three that has been telling Mr.

16  Grantham this -- but he has been telling Mr. Grantham, "Don't

17  bad-order any cars today; tomorrow, Rebecca Gardner will be

18  here; you bad-order all you want, but not today, not on my

19  watch."  Sending them messages, "You are killing me with these

20  bad orders, you know, don't do it, don't do it," because they

21  are being pressured for their on-time departures; they have to

22  answer for train delays.

23      Well, he also -- "he" being Mr. Grantham -- he has a

24  responsibility to public safety.  He's been certified as a car

25  inspector, and so if he goes along with Mr. Murray's "If it

1    rolled in it can roll out" philosophy and something happens down

2    the road, then, you know, he's going to be morally and legally

3    responsible for whatever those consequences are.

4         THE COURT:  What about Gardner and Thoele?

5         THE WITNESS:  Gardner, she knew and this -- she and

6    Murray both are involved in the charging him for the train

7    delay.

8         When the clown joke comes, she's the one who puts in the

9    assessment and says, "Hey, he did this."  And she's the one who

10   calls Thoele and says, "As soon as you get finished with that

11   hearing, he's got to go."

12        They knew that very day that they pulled him out of

13   service that they had the wrong person.  Yet they send a charge

14   letter out the next day and that goes out under Rebecca

15   Gardner's signature.

16        THE COURT:  And so where in the statute would it

17   encompass that type of conduct?

18        MR. BURGE:  Treating differently.  They didn't -- she

19   didn't pull the person who came, Chad Moore, who came in and

20   said, you know, "I did it."  She didn't pull him out.

21        Murray, he doesn't charge -- he doesn't send charge

22   letters out or he doesn't enter assessments against Mr. Bartram.

23   He was the employee who was working there until noon and left to

24   take care of a family matter.

25        He and Mr. Grantham inspected and did Class 1 brake

1    tests on Train 451, which was only three rail cars different in

2    length than the 251 that Grantham got charged for.  They did it

3    in the same amount of time with the exception of 30 minutes, but

4    all of the witnesses admitted that Mr. Grantham had to leave the

5    251 for 30 minutes to go finish what was being done on the roll-

6    by inspection of 451.

7         So Mr. Grantham has done the same work in the same

8    amount of time and they don't charge Mr. Bartram.  Mr. Keen and

9    Mr. Hickox got a direct order, "You go do this."

10        And as Mr. Grantham explained at the investigation

11   hearing and at his deposition, "I can't stop them from doing

12   it," and to understand what's going on is Mr. Murray sends,

13   tells two people, "Y'all are going to help."  Doesn't tell Mr.

14   Grantham, although he put it in the assessment.

15        He later admitted that "When I put that in there, that

16   was false, but I didn't tell Mr. Grantham," but those two people

17   are sent over and they don't help.  They just don't.

18        If it was somebody who was out digging a hole and two

19   other people showed up with shovels, one of them couldn't stop

20   the other two from digging, too.  The same is true here.  The

21   problem was they come here an hour late.

22        By the time they get there an hour late, Mr. Grantham

23   has gone between every one of those 130 cars and he has buckled

24   the air hoses already.  He has attached the telemetry device

25   that shows air pressure on the back of the train.  He's gone to

1  the front of the train, and he has attached an air hose that is

2  going to charge the thing.

3       THE COURT:  I know, it measures the --

4       MR. BURGE:  Brief history lesson, the briefest.

5       THE COURT:  I know about --

6       MR. BURGE:  So you've got it?

7       THE COURT:  Yeah, I do.

8       MR. BURGE:  Westinghouse, well, this is the system, and

9  so it takes time and what Ms. Gardner says is, you know, when

10  people come -- will it make it faster for multiple people to be

11  doing the job?  Yes, when it comes to buckling, but once you've

12  got it all charged up, there's really not much can be done

13  because you charge it all up, which should bring the brake shoes

14  away from the wheels and the piston out the appropriate length,

15  and then you ride up one side and down the other.

16       What he got blamed for was the two-hour and two-minute

17  delay.  That's Thoele, who was the hearing officer, decides

18  whether the charges are proven, and then they recommend

19  discipline, so he says "Oh, this is all proven, because he

20  caused a train delay of two hours and two minutes."

21       Well, that's the time that it took to set out these

22  cars, so it's all related to his bad-ordering the cars, and each

23  of these people say that they've been trained to know better,

24  and you WERE asking about punitive damages earlier.

25       Last week, the judge, he took the Eleventh Circuit

1    charge in one of the discrimination cases and pointed out an

2    opinion, and so he modified it to say that not only do you have

3    to -- that training is not enough; it's about training and

4    enforcement.  You have to have the training there and you have

5    to follow it, and that's what's needed, and he said I hadn't

6    been traveling under the intentional part, so he limited it to

7    the reckless and callous indifference part, so those were the

8    modifications to the charge.

9         THE COURT:  Sort of back up to the causation standard.

10   Just hypothetically, if I were to find that intentional

11   retaliation was a correct application of the contributing factor

12   language in FRSA, is there any evidence of intentional

13   retaliation?

14        MR. BURGE:  I think in an employment setting,

15   retaliation has a very specialized meaning.  It's not the

16   colloquial meaning to get even with somebody.

17        THE COURT:  So even if I used that standard, you would

18   be able to point to evidence that would satisfy it?

19        MR. BURGE:  Exactly.  We would just go to the Eleventh

20   Circuit pattern, and we would go to one of the retaliation

21   charges and we would see that all retaliation is is taking an

22   adverse action against somebody and that their protected status

23   or protected activity is a factor, and how big a factor, of

24   course, is going to change from act to act, but here we have the

25   lowest, you know, as it related even in the slightest to what

1   happened, but it's just proving those elements, so once we prove

2   the elements of our prima facie case, we have shown intentional

3   retaliation, and obviously they have to know about it, and

4   that's the knowledge element.

5          But... and to the extent that they're -- CSX has

6   contended that it means the colloquial meaning, that's just not

7   true.  We just have to prove by a preponderance that he engaged

8   in a protected activity; they knew about it; he suffered an

9   adverse action; and that there is some connection.

10         And at that point we're entitled to recover unless,

11  unless they can show by clear and convincing evidence that they

12  would have done the same thing, and there's a total failure on

13  their part there as we've taken their 30(b)(6) witness and, you

14  know, "How many people have you ever done this to?"

15         "Well, we don't have a standard for what is a reasonable

16  amount of time.  We don't have any objective standard.  We're

17  just -- and we've never done this to anybody else."

18         THE COURT:  All right.  Mr. Burge, I appreciate the

19  arguments on both sides.  I'm going to bring us to a close here

20  after an hour of argument, and I will leave the record open,

21  though, for ten days if there's anything that you wish you had

22  added, or as you're traveling back home, if you think of things

23  that you wish you had said based on questions that I've asked,

24  I'll leave the record open for briefing.  It's not required but

25  it is permitted.

32

1          All right, counsel, we will be in recess.

2          (Proceeding concluded at 2:56 p.m.)

3

4                        CERTIFICATION

5

6          I certify that the foregoing is a true and correct

7     transcript of the stenographic record of the above-mentioned

8     matter.

9

10

12     _____         11/10/2021

13     Debra Gilbert, Court Reporter          Date

14

15

16

17

18

19

20

21

22

23

24

25